# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LESLIE ANN SHIRLEY,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:15-cv-726

Barrett, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Leslie Ann Shirley brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for disability insurance benefits ("DIB"). This matter is before the Court on plaintiff's statement of errors (Doc. 13), the Commissioner's memorandum in opposition (Doc. 18), and plaintiff's reply memorandum (Doc. 21).

## I. Procedural Background

Plaintiff filed her application for DIB in August 2011, alleging disability since February 26, 2007 due to generalized epilepsy disorder, migraines, and depression. The application was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a hearing before administrative law judge ("ALJ") Larry A. Temin. Plaintiff, a medical expert, and a vocational expert ("VE") appeared and testified at the ALJ hearing. On March 26, 2014, the ALJ issued a decision denying plaintiff's DIB application. Plaintiff's request for review by the Appeals Council was denied, making the ALJ's decision the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

2

perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] last met the insured status requirements of the Social Security Act on June 30, 2012.

2. The [plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of February 26, 2007 through her date last insured of June 30, 2012 (20 CFR 404.1571, *et seq.*).

3. Through the date last insured, the [plaintiff] had the following severe impairments: a seizure disorder; obesity; lumbar spine degenerative changes; degenerative changes of the bilateral patellofemoral joints; and a mood disorder (20 CFR 404.1520(c)).

4. Through the date last insured, the [plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the [plaintiff] had the residual functional capacity [("RFC")] to perform light work as defined in 20 CFR 404.1567(b). Specifically, the [plaintiff] can perform work activity except as follows: The [plaintiff] can lift/carry/push/pull up to 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for 6 hours in an 8-hour workday, and can sit for 6 hours in an 8-hour workday. The [plaintiff] is limited to no more than occasional stooping, kneeling, crouching, and climbing of ramps and stairs. She should never craw, climb ladders/ropes/scaffolds, or work at unprotected heights or around hazardous machinery. The [plaintiff] is able to perform only simple, routine, repetitive tasks and is able to remember and carry out only short and simple instructions. Her job should not require more than superficial and occasional interaction with the general public, coworkers, or supervisors. She cannot work at a rapid production-rate pace. Her job should not require more

3

than ordinary and routine changes in work setting or duties. The [plaintiff] is able to make only simple work-related decisions.

6. Through the date last insured, the [plaintiff] was unable to perform any past relevant work (20 CFR 404.1565).[1]

7. The [plaintiff] was born [in] 1973 and was 39 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the [plaintiff's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [plaintiff] could have performed (20 CFR 404.1569 and 404.1569(a)).[2]

11. The [plaintiff] was not under a disability, as defined in the Social Security Act, at any time from February 26, 2007, the alleged onset date, through June 30, 2012, the date last insured (20 CFR 404.1520(g)).

(Tr. 26-39).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

---

[1] Plaintiff's past relevant work was as a kennel attendant and a nurse assistant, both medium semi-skilled positions; a night auditor, a sedentary, skilled position; and an administrative clerk, a sedentary, semi-skilled position. (Tr. 38, 98, 242).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light occupations such as cleaner/housekeeper, with 1,500 jobs regionally and 275,000 nationally; an assembler of small products, with 6,000 jobs regionally and 675,000 nationally; and an inspector, with 1,600 jobs regionally and 190,000 nationally. (Tr. 38, 99-100).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

On appeal, plaintiff argues that the ALJ: (1) failed to properly weigh the opinion of treating psychiatrist Kode Murthy, M.D.; (2) improperly ignored pertinent portions of the opinion of consultative examining psychologist Andrea Johnson, Psy.D.; (3) failed to properly evaluate plaintiff's subjective complaints and credibility; (4) failed to consider the impact of plaintiff's obesity on her ability to work; and (5) failed to properly evaluate plaintiff's RFC. (*See generally* Doc. 13).[3]

---

[3] As they are related, the Court considers assignments of error 4 and 5 together.

### 1. *Substantial evidence supports the ALJ's assessment of Dr. Murthy's opinion.*

Plaintiff argues the ALJ failed to give appropriate weight to the opinion of her treating physician Dr. Murthy. (Doc. 13 at 13-18).[4] Plaintiff contends that the opinions of non-examining state consultative psychologists do not constitute substantial evidence in support of the ALJ's assessment because they rendered their opinions before the agency received plaintiff's medical records. (*Id.* at 15). Plaintiff argues the ALJ cherry-picked portions of the record that supported his findings instead of properly analyzing the entire record. (*Id.* at 17). Plaintiff contends the ALJ failed to give good reasons for rejecting Dr. Murthy's opinion. (*Id.* at 17-18).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20

---

[4] Page citations to plaintiff's brief refer to the page numbers provided by CM/ECF.

C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-2p, 1996 WL 374188 at *5 (1996)). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

The medical record shows that plaintiff first saw Dr. Murthy on June 22, 2012. (Tr. 513). Plaintiff complained of a history of crying spells, occasional suicidal thoughts, and recent weight gain. Plaintiff had a good appetite and good sleep, and she was "good with help of meds." (*Id.*). On examination, Dr. Murthy found that plaintiff was able to express herself well, was depressed, and was not anxious. Plaintiff had a good memory, no psychosis, a blunted affect, intact

7

judgment, and superficial insight. Dr. Murthy diagnosed plaintiff with bipolar affective disorder and assigned her a GAF score of 55.[5] Dr. Murthy increased the dosage of plaintiff's Zoloft from 100 milligrams daily to 200 milligrams daily. (*Id.*).

When seen on July 13, 2012 for medication management, plaintiff reported her medications were helping and she did not have any suicidal or homicidal thoughts. (Tr. 514).

On July 30, 2012, Dr. Murthy completed a questionnaire for disability purposes. (Tr. 419-21, 515-16). Dr. Murthy reported that plaintiff had a depressed mood and blunted affect, poor concentration, patchy memory, poor frustration tolerance, moderate impairment of daily activities, and moderate impairment of interests, habits, and behavior. (Tr. 420, 515-16). Dr. Murthy also found that plaintiff had poor social interactions and a poor ability to tolerate stress. (Tr. 420-21, 516). Dr. Murthy indicated he had seen plaintiff at only two appointments before completing the questionnaire. (Tr. 421, 516).

Dr. Murthy saw plaintiff at ten additional appointments for medication management between August 2012 and February 2014, but his treatment notes are largely unremarkable. (*See* Tr. 514-15). Notably, Dr. Murthy remarked that an increased dosage of Wellbutrin was "helpful" in September 2012, that plaintiff complained of "feeling more depressed and more agitated" in October 2012, and that plaintiff was "doing well with medications" in December 2012. (*See* Tr. 514).

---

[5] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. Individuals with GAF scores of 51 to 60 have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

In September 2013, Dr. Murthy completed a mental status questionnaire in which he noted that plaintiff's symptoms included marked diminished interest or pleasure in almost all activities (except playing with her five-year-old son), appetite disturbance with change in weight, sleep disturbance characterized by frequent awakening, psychomotor retardation, decreased energy, feelings of worthlessness, and difficulty concentrating. (Tr. 464, 516). Dr. Murthy opined that plaintiff had extreme limitations in her ability to: (1) complete a normal workday and workweek without interruption from psychological symptoms; (2) understand, remember, and carry out complex job instructions; and (3) deal with work-related stress on a sustained basis. (*Id.* at 465-66; 516-17). Dr. Murthy opined that plaintiff had marked limitations in her ability to: (1) understand, remember, and carry out detailed, but not complex, job instructions; (2) perform activities within a schedule; (3) function independently; (4) get along with coworkers or peers; (5) maintain socially appropriate behavior; (6) be aware of normal hazards and take appropriate precautions; (7) respond appropriately to workplace changes; (8) perform activities of daily living; (9) maintain social functioning; and (10) maintain concentration, persistence, or pace. (*Id.* at 465-66, 517). Further, Dr. Murthy opined that plaintiff had moderate limitations in her ability to: (1) understand and remember simple instructions; (2) carry out short, simple instructions; (3) maintain regular attendance and be punctual; (4) work in coordination with or proximity to coworkers without distraction; (5) accept instructions and criticisms from supervisors; and (6) make simple work-related decisions. (Tr. 465, 517). In support of his opinion, Dr. Murthy noted that plaintiff "was on several psychotropic meds before she came to see me and now she is on from me: 1). Zoloft, 2). Abilify, 3). Lithium." (Tr. 466, 517).

The ALJ declined to give controlling weight to Dr. Murthy's September 2013 opinion, finding that it was not well-supported by medically acceptable clinical and diagnostic laboratory techniques and was not consistent with the other substantial evidence in the record. (Tr. 37).

The ALJ noted that Dr. Murthy's treatment records "are quite brief and do not support the limitations he gives." (*Id.*). Further, the ALJ found that the single progress note that predated plaintiff's date last insured did not support the work-related limitations contained in Dr. Murthy's opinion. The ALJ concluded that Dr. Murthy's assessment of a GAF score of 55 was indicative of moderate symptomatology and was consistent with the record. The ALJ found that the limitations that Dr. Murthy identified were not consistent with plaintiff's GAF score or the record. The ALJ also noted that Dr. Murthy did not cite any support for his opinion and did not state that the limitations he identified were in effect prior to plaintiff's date last insured. The ALJ gave Dr. Murthy's opinion little weight, finding that while he was a treating psychiatrist, he only saw plaintiff once before her date last insured and his progress notes did not support his conclusions or provide substantive information about plaintiff's functioning. (*Id.*).

Here, the ALJ gave good reasons for not giving Dr. Murthy's opinion controlling weight and those reasons are substantially supported by the record. First, substantial evidence supports the ALJ's determination that Dr. Murthy's opinion was inconsistent with his treatment notes. At plaintiff's first appointment with Dr. Murthy in June 2012, she complained of crying spells, occasional suicidal thoughts, and recent weight gain, and her mental status examination revealed depression and blunted affect, but Dr. Murthy noted that she was "good with help of meds" and had good appetite, sleep, and memory. (Tr. 513). At her next appointment in July 2012, Dr. Murthy noted that plaintiff's medications were helping and she did not have any suicidal or homicidal thoughts. (Tr. 514). Dr. Murthy reported no abnormal findings at later appointments except plaintiff's complaint of feeling more depressed and agitated in October 2012. (*See* Tr. 514-15). Further, Dr. Murthy noted that plaintiff's medications were helping her at appointments in September and December 2012. (Tr. 514). In short, the lack of abnormal findings in Dr. Murthy's treatment records is inconsistent with the extensive limitations he identified in his

September 2013 opinion. Thus, the ALJ properly discounted the conclusory findings in Dr. Murthy's opinion concerning the degree of plaintiff's functional limitations. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.").

Second, the ALJ properly noted that Dr. Murthy's September 2013 opinion was submitted more than a year after plaintiff's date last insured and failed to indicate whether the limitations he identified were present before the date last insured. To obtain DIB benefits, plaintiff must establish that the "onset of disability" was prior to June 30, 2012, the date her insured status expired, and that her disability lasted for a continuous period of twelve months. 42 U.S.C. § 423(a), (c), (d)(1)(A). *See Smith v. Comm'r of Soc. Sec.*, 202 F.3d 270 (6th Cir. 1999) (citing *Moon v. Sullivan,* 923 F.2d 1175, 1182 (6th Cir. 1990); *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). Post-insured status evidence of new developments in a claimant's condition is generally not relevant. *Bagby v. Harris*, 650 F.2d 836 (6th Cir. 1981). Such evidence may be examined, however, when it establishes that the impairment existed continuously and in the same degree from the date plaintiff's insured status terminated. *See Johnson v. Sec'y of H.E.W.*, 679 F.2d 605 (6th Cir. 1982). *See also King v. Sec'y of HHS*, 896 F.2d 204, 205-06 (6th Cir. 1990) (post-expiration evidence may be considered, but it must relate back to plaintiff's condition prior to the expiration of date last insured). In his opinion, Dr. Murthy failed to specify whether the limitations he identified in September 2013 were also present prior to the expiration of plaintiff's insured status on June 30, 2012, despite being explicitly asked, "how long (date you were able to support this assessment) the individual has been impaired by these findings." (Tr. 517). Nor do Dr. Murthy's treatment notes reflect that plaintiff's functional limitations in September 2013 were of the same degree as those before her

11

insured status lapsed. Thus, the ALJ reasonably relied on this deficiency in assessing Dr. Murthy's opinion.

For these reasons, the Court determines that the ALJ reasonably declined to give Dr. Murthy's opinion controlling weight. *See Gayheart*, 710 F.3d at 376.

Moreover, substantial evidence supports the ALJ's consideration of the regulatory factors in weighing Dr. Murthy's opinion. *See* 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ noted that Dr. Murthy was a specialist in the field of mental health and began treating plaintiff in June 2012. *See* 20 C.F.R. § 404.1527(c)(2), (5). However, in affording little weight to Dr. Murthy's opinion, the ALJ emphasized that Dr. Murthy only saw plaintiff once before her date last insured of June 30, 2012, and his opinion of September 2013 was not supported by his treatment notes. *See* 20 C.F.R. § 404.1527(c)(2)-(3). As explained above, substantial evidence supports these reasons for discounting Dr. Murthy's opinion.

The ALJ also considered the consistency of Dr. Murthy's opinion with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(4). Dr. Murthy's opinion was inconsistent with those of Drs. Rivera and Lewin, the non-examining state agency psychological consultants, and Dr. Rogers, the medical expert who testified at the hearing. All three psychologists opined that plaintiff's mental limitations were not work-prohibitive. Plaintiff takes issue with the ALJ's decision to give greater weight to the opinions of the state agency psychologists and medical expert, arguing that none of these psychologists actually examined plaintiff, whereas Dr. Murthy treated plaintiff for twenty-one months. Plaintiff also contends that Drs. Rivera and Lewin completed their reports prior to any mental health treatment records being received into the records.

Plaintiff's focus on the long-standing nature of Dr. Murthy's treating relationship is misplaced because, as explained above, Dr. Murthy treated plaintiff on only one occasion prior

to the expiration of her insured status and failed to relate the limitations he assessed in September 2013 back to the date he first treated plaintiff. Therefore, the ALJ was not required to give more weight to Dr. Murthy's opinion on this basis. Nor was the ALJ required to give Dr. Murthy's opinion more weight based on the treating physician's area of specialization given that Drs. Rogers, Rivera, and Lewis likewise specialize in the treatment of mental illness. *Cf.* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). The ALJ reasonably noted that plaintiff had received little in the way of mental health treatment prior to her date last insured and that the opinions of Drs. Rivera and Lewis were consistent with those sparse treatment records and with the actual examination findings of Dr. Johnson, the consultative examining psychologist. (Tr. 36). In addition, the ALJ reasonably considered that Dr. Rogers, the medical expert, had the benefit of examining all the evidence in the record, as well as plaintiff's hearing testimony, in rendering his opinion on plaintiff's functional capacity prior to her date last insured. (Tr. 37). *See* 20 C.F.R. § 404.1527(c)(6) ("the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, . . . and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion"). Based on the foregoing, substantial evidence supports the ALJ's assessment of Dr. Murthy's opinion and this assignment of error should be overruled.

### 2. *Substantial evidence supports the ALJ's assessment of Dr. Johnson's opinion.*

Plaintiff argues the ALJ failed to give appropriate weight to the opinion of consultative psychologist Dr. Johnson. (Doc. 13 at 10). Plaintiff contends the ALJ erred by ignoring parts of Dr. Johnson's opinion that indicated plaintiff would show a pattern of time away from work for

mental health reasons and would not respond appropriately to coworkers. Plaintiff argues that the ALJ improperly discounted Dr. Johnson's opinion for being based on plaintiff's self-reported symptoms because psychological treatment is dependent on a patient's subjective complaints. (*Id.*). Plaintiff contends the ALJ cherry-picked only those portions of Dr. Johnson's opinion that supported a finding of non-disability. (*Id.* at 10-11).

"[O]pinions from nontreating . . . sources are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376. "The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling." *Id.* (citing 20 C.F.R. § 404.1527(c)). "Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion." *Id.* (quoting 20 C.F.R. § 404.1527(c)(6)).

Dr. Johnson, a clinical psychologist, examined plaintiff in April 2012 for disability purposes. (Tr. 374-79). Plaintiff reported that she socializes with a group of girlfriends, her husband, her best friend, and her son. (Tr. 375). Her level of social functioning had not declined recently and she reported participation in several hobbies and social activities, including dinner with friends, walks in the park, parties, and taking her son to playdates with her friends' children. Plaintiff endorsed a history of undiagnosed learning difficulties, including "a problem retaining information." (*Id.*). Plaintiff reported that she had a history of seizures and took psychiatric medications prescribed by her neurologist and primary care physician to help manage symptoms but she continued to experience difficulties. Specifically, plaintiff reported that she was taking Topamax (antiepileptic), Klonopin (a benzodiazepine used to prevent and treat seizures), and Zoloft (antidepressant). (*Id.*). Plaintiff reported a history of anger/rage issues but was not currently receiving mental health treatment. (Tr. 376).

14

Plaintiff reported that she was terminated from a job at a nursing home in 2007 for "anger issues." (*Id.*). She reported difficulty interacting with other staff members, a "significant" history of interpersonal problems with supervisors and coworkers, and "some" history of difficulty in maintaining adequate pace at past jobs. Dr. Johnson noted that based on plaintiff's reported history of anger problems "[s]he is likely to have some difficulties with job related tasks." (*Id.*). Plaintiff reported doing all activities of daily living necessary to care for her son, her home, and herself. (*Id.*).

On mental status examination, plaintiff was "marginally cooperative" and volunteered information and details readily. (*Id.*). Plaintiff's mood was irritable with congruent affect and she was tearful during the evaluation. (Tr. 377). Dr. Johnson noted no manifestations of anxiety, but plaintiff endorsed subjective anxiety. Plaintiff's attention and concentration were fair, her ability to abstract was adequate, her cognitive functioning was estimated to be in the low average range of functioning, and she was able to understand and follow directions. Dr. Johnson noted that plaintiff demonstrated no difficulties with her memory during the evaluation but also noted that she performed below average on memory/recall tasks. Plaintiff had fair insight, good motivation, and appeared psychologically capable of living independently, making decisions about her future, and seeking appropriate community services. (*Id.*).

Dr. Johnson diagnosed plaintiff with a mood disorder and personality disorder and assigned a GAF score of 60. (Tr. 378). Dr. Johnson opined that plaintiff would have some difficulties with job-related tasks due to mental health problems. Dr. Johnson noted that plaintiff was able to understand and follow directions and seemed capable of applying instructions that required low average intellectual functioning. Dr. Johnson opined that plaintiff was able to concentrate on tasks and would show work pace similar to her work peers. However, Dr. Johnson opined that plaintiff was "likely to show a pattern of periods of time away from work

for mental health reasons." (*Id.*). Dr. Johnson noted that plaintiff's interaction during the evaluation was marginally adequate, but opined that plaintiff was unlikely to respond appropriately to coworkers in a work setting due to a reported history of significant interpersonal problems with supervisors and coworkers. (Tr. 379). Dr. Johnson opined that based on plaintiff's self-reported history, she was unable to respond appropriately to work stress. However, Dr. Johnson opined that plaintiff was currently experiencing some stressors and had adequate social supports in place to effectively cope with additional stressors. (*Id.*).

The ALJ gave only some weight to Dr. Johnson's opinion because he found her opinion to be internally inconsistent. (Tr. 36). Substantial evidence supports the ALJ's assessment of Dr. Johnson's opinion. While the ALJ's decision could have been clearer in addressing the regulatory factors, his analysis of Dr. Johnson's opinion "reache[d] several of the factors that an ALJ must consider." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009). For example, the ALJ noted that Dr. Johnson was a psychologist and consultative examiner. *See* 20 C.F.R. § 404.1527(c)(1) and (5). The ALJ also noted internal inconsistencies in Dr. Johnson's opinion and found that many of her conclusions were supported only by plaintiff's self-reported symptoms. *See* 20 C.F.R. § 404.1527(c)(3)-(4). The ALJ reasonably found that the GAF score of 60, which indicates only moderate symptoms, was not consistent with the more significant functional limitations contained in Dr. Johnson's narrative. (Tr. 36). In addition, the ALJ found those more significant functional limitations to be inconsistent with plaintiff's functionality. For example, while Dr. Johnson noted a low/average level of intellectual functioning, the ALJ found this to be inconsistent with the fact that plaintiff earned an associate's degree, held skilled and semiskilled jobs, and was on the Dean's list in a medical billing program with a 4.0 GPA. (Tr. 36, 52-53, 306, 481). Further, the ALJ reasonably concluded that Dr. Johnson's opinion that plaintiff would have significant interpersonal problems was inconsistent with plaintiff's full

16

social life and regular interaction with friends. (Tr. 36, 375). Finally, the ALJ reasonably found that Dr. Johnson's conclusion that plaintiff would show a pattern of time away from work for mental health reasons and respond inappropriately to coworkers was not supported by Dr. Johnson's examination and was based primarily on plaintiff's self-report. (Tr. 36).

Plaintiff contends the ALJ improperly discounted Dr. Johnson's opinion for being based on plaintiff's self-reported symptoms because psychological treatment is dependent on a plaintiff's subjective complaints. (Doc. 13 at 10, citing *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp.2d 807 (N.D. Ohio 2009)). In *Winning*, a treating psychologist rendered an opinion after seeing the claimant on 42 separate occasions. *Winning*, 661 F. Supp.2d at 820. The ALJ rejected the treating psychologist's opinion on the basis that it relied "substantially on the subjective presentation and statements of the claimant, who is not found to be entirely credible." *Id.* at 821. The court found "this conclusory comment, without any elaboration or detail" insufficient to satisfy the procedural requirements for rejecting a treating physician's opinion. *Id.* The court determined that the ALJ's reasoning was "illogical" because "psychology and psychiatry are, by definition, dependent on subjective presentations by the patient." *Id.* The court concluded that "[t]aken to its logical extreme, the ALJ's rationale for rejecting [the treating psychologist's] conclusions would justify the rejection of opinions by all mental health professionals, in every case." *Id.*

Unlike the treating psychologist in *Winning*, who saw the claimant 42 times over a two year period, here Dr. Johnson examined plaintiff on only one occasion and did not review any prior mental health treatment records. Nor was Dr. Johnson's opinion subject to the greater scrutiny afforded a treating physician's opinion. Thus, *Winning* is distinguishable from the instant case.

The ALJ properly considered the extent to which Dr. Johnson's opinion was supported by the objective and clinical evidence, as opposed to plaintiff's subjective allegations alone. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.") Objective evidence in the psychiatric/psychological context includes "medical signs," 20 C.F.R. § 404.1512(b)(1), which are defined as "*psychological abnormalities which can be observed, apart from your statements* (symptoms). . . . Psychiatric signs are *medically demonstrable* phenomena that indicate specific psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1528(b) (emphasis added). The ALJ reasonably determined that Dr. Johnson based her opinion regarding plaintiff's work absences and inability to appropriately respond to coworkers on plaintiff's self-reported symptoms. By relying on plaintiff's self-reports as opposed to objective findings or observations, Dr. Johnson "[e]ssentially . . . made a credibility finding which is at odds with that of the ALJ." *Staymate v. Colvin*, No. 2:15-cv-2744, 2016 WL 1317992, at *5 (S.D. Ohio Apr. 5, 2016) (Report and Recommendation) (Kemp, M.J.), *adopted*, 2016 WL 3355454 (S.D. Ohio Jun. 17, 2016) (Marbley, J.). *See also Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 274 (6th Cir. 2010) (explaining that a plaintiff's self-reported history and subjective complaints of psychological symptoms, which were the bases for a medical opinion, "were insufficient to persuade the ALJ that [the plaintiff] was disabled," an issue reserved to the ALJ). In light of the ALJ's finding that plaintiff was not fully credible, which is supported by substantial evidence as explained below, the ALJ was justified in discounting Dr. Johnson's opinion on the ground she relied largely on plaintiff's self-reported symptoms. Contrary to plaintiff's argument, the ALJ did not "ignore" Dr. Johnson's findings that plaintiff

18

would show a pattern of time away from work and not respond appropriately to coworkers. Rather, the ALJ rejected those findings as lacking support. As substantial evidence supports the ALJ's decision to reject these specific findings, plaintiff's assignment of error should be overruled.

### 3. *Substantial evidence supports the ALJ's evaluation of plaintiff's credibility.*

Plaintiff argues the ALJ erred in evaluating her credibility. (Doc. 13 at 12-13). Plaintiff contends that nothing in the record "would effectively refute [her] testimony . . . as to intensity, persistence and limiting effects of [her] symptoms." (*Id.* at 12). Plaintiff argues her subjective complaints must be fully credited because "her testimony was consistent with the reports of both the examining consultants and her own treating sources." (*Id.* at 13).

In light of the ALJ's opportunity to observe the individual's demeanor at the hearing, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Buxton*, 246 F.3d at 773; *Kirk v. Sec'y of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

At a hearing before the ALJ, plaintiff testified that she had four to five grand mal seizures a year and small generalized seizures or petit mal seizures several times a month. (Tr. 58). She stated she had five grand mal seizures in 2012 and five or six in 2013. (Tr. 62). Plaintiff testified that she suffered from bipolar disorder and depression, which resulted in anger management issues and suicidal and homicidal thoughts. (Tr. 69). She reported having trouble sleeping, very low energy, poor self-esteem, concentration difficulties, and bad short-term

19

memory. (Tr. 71). Plaintiff believed her medications helped to some extent, but stated she still had bad days where she was unable to control her anger or homicidal thoughts. (Tr. 73). Plaintiff reported that she did not get along well with others and was unable to maintain relationships. (Tr. 73-74).

The ALJ found that plaintiff's impairments could reasonably be expected to cause her alleged symptoms but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 33). Specifically, as to plaintiff's seizure disorder, the ALJ found that her seizures were "relatively well-controlled" prior to May 2011. (*Id.*). The ALJ noted plaintiff did not see a neurologist between February 2010 and February 2011, which "suggests that her seizures were relatively well-controlled during that period, or at least not at a level as severe as alleged." (*Id.*). The ALJ also noted that plaintiff completed a form in March 2012 in which she stated that that her epilepsy "has been under control with meds for many years." (*Id.*).

As to plaintiff's allegations concerning her mental health, the ALJ found that the record did not support the alleged severity prior to her date last insured. (Tr. 35). The ALJ noted that plaintiff "was apparently found to be stable enough to adopt a child in 2008." (*Id.*). Further, plaintiff's treating neurologist, Dr. Guo, "opined that [she] had an appropriate mood and affect and her memory was appropriate" in September and November 2011 and January 2012. (*Id.*).

Here, substantial evidence supports the ALJ's finding that plaintiff's allegations concerning the severity of her symptoms were not entirely credible. As to plaintiff's allegations concerning her seizures, neurologist Marvin Rorick, M.D., noted in February 2009 that plaintiff had been well over the past year with no generalized tonic clonic activity and only "several small episodes in which she 'phases out.'" (Tr. 479). In May 2009, plaintiff reported "good seizure control" and "feeling much more normal." (Tr. 475). In November 2009, Dr. Rorick noted that

20

plaintiff's seizures were "well controlled on current medication" and approved plaintiff to begin driving again as she did "not appear to be representing any road hazard at this time." (Tr. 474). In February 2010, plaintiff reported to Aring Neurology that her seizures were "currently controlled on medications." (Tr. 346). In February 2011, neurologist Tamer Abou-Elsaad, M.D., noted that plaintiff had not had a generalized tonic clonic seizure in six months. (Tr. 342). Dr. Abou-Elsaad concluded that plaintiff's epilepsy seemed to be controlled with medication. (Tr. 344).

In May 2011, plaintiff began treating with neurologist Z. George Guo, M.D. (Tr. 340-41). Plaintiff complained of "zoning spacing type" seizures several times a month and grand mal seizures once every several months. (Tr. 340). Dr. Guo concluded that plaintiff was experiencing epileptic seizures mostly compatible with complex partial seizures and that her medication needed to be further adjusted. (Tr. 341). In September 2011, plaintiff reported three to four spells per week and one trip to the emergency room for a seizure episode. (Tr. 358). In November 2011, plaintiff reported seizure activity on a weekly basis. (Tr. 360). Dr. Guo adjusted plaintiff's seizure medications. (Tr. 359, 361). In January 2012, plaintiff reported no seizure activity for the past month. (Tr. 362).

In March 2012, plaintiff reported to primary care physician Barry Rubin, D.O., that her seizure disorder was controlled and that she had not had a seizure in "a long time." (Tr. 407). In June 2012, Dr. Rubin noted that plaintiff's seizure disorder was controlled. (Tr. 397). In July 2012, F. Clifford Valentin, M.D., a specialist in physical medicine and rehabilitation, noted that plaintiff's seizure disorder was well controlled. (Tr. 392).

This medical history constitutes substantial support for the ALJ's credibility determination as to plaintiff's seizure allegations. Specifically, from her alleged onset date through her date last insured, plaintiff's providers regularly noted that her seizure disorder was

21

well controlled with medication, except for a six-month period from May through November 2011. (*See* Tr. 340-41, 358-61). Thus, plaintiff's medical history does not support her allegations of four to five grand mal seizures a year and small generalized seizures or petit mal seizures several times a month, and the ALJ properly discounted plaintiff's credibility concerning the severity of her seizures. (*See* Tr. 58).

As to plaintiff's allegations concerning her mental health, on February 2, 2009, Dr. Rorick noted that plaintiff continued to have mild symptoms of depression for which she took Celexa. (Tr. 479). Plaintiff complained of an increased number of mood swings. (*Id.*). On February 26, 2009, plaintiff reported feeling somewhat suicidal. (Tr. 477). Dr. Rorick ordered plaintiff to immediately discontinue taking Keppra for her seizure disorder. (*Id.*). In May 2009, plaintiff reported that her psychological symptoms were much better after Keppra was discontinued. (*See* Tr. 475). In November 2009, Dr. Rorick noted that plaintiff's depression was stable on Celexa. (Tr. 473).

In February 2010, plaintiff reported to Aring Neurology that Celexa was not working for her depression anymore. (Tr. 346). The neurologist at Aring noted that plaintiff scored a 16 on the Neurological Disorder Depression Inventory for Epilepsy ("NDDI-E") and needed to address her depression with her primary care physician.[6] In August 2010, plaintiff saw Dr. Rubin about getting an antidepressant. (Tr. 354). Dr. Rubin prescribed Wellbutrin. (*Id.*). In January 2011 plaintiff reported that her mood and nerves were "doing pretty well" on Wellbutrin. (Tr. 353-54). In June 2011, Dr. Rubin discontinued Wellbutrin and prescribed Zoloft. (Tr. 351-52). In

---

[6] The NDDI-E "is a 6-item questionnaire validated to screen for depression in people with epilepsy." David E. Friedman, M.D., et al., "Systematic Screening in a Busy Clinical Setting Improves Identification of Depression in People with Epilepsy," *available at* https://www.bcm.edu/neurology/pdf/poster_cecsc_DepressionEpilepsy.pdf. NDDI-E scores greater than 16 are considered positive for depression. *Id.*

July 2011, plaintiff reported that her medical issues were generally controlled but that her Zoloft dosage was "not quite enough." (Tr. 350).

In September and November 2011 and January 2012, plaintiff reported mood swings and memory loss to Dr. Guo. (Tr. 358, 360, 362). On examination, Dr. Guo noted that plaintiff's recent remote memory, mood, and affect were all appropriate. (Tr. 359, 361, 363).

Plaintiff reported to Dr. Johnson in April 2012 that she was taking Zoloft for depression. (Tr. 375). Plaintiff also reported a history of anger/rage issues but she was not receiving mental health treatment. (Tr. 376). On examination, plaintiff's mood was irritable and she was tearful. (Tr. 377). Dr. Johnson concluded that plaintiff had fair insight, good motivation, and appeared psychologically capable of living independently, making decisions about her future, and seeking appropriate community services. (*Id.*).

At two appointments with Dr. Rubin in June 2012, plaintiff did not complain of any psychological concerns. (*See* Tr. 396-401). Plaintiff remained on Zoloft. (*Id.*).

On June 22, 2012, plaintiff first saw Dr. Murthy for her psychological symptoms. (Tr. 513). Plaintiff complained of a history of crying spells, occasional suicidal thoughts, and recent weight gain. Plaintiff had a good appetite and good sleep, and she was "good with help of meds." (*Id.*). On examination, Dr. Murthy found that plaintiff was able to express herself well, was depressed, and was not anxious. Plaintiff had a good memory, no psychosis, a blunted affect, intact judgment, and superficial insight. Dr. Murthy diagnosed plaintiff with bipolar affective disorder and assigned her a GAF score of 55. Dr. Murthy increased the dosage of plaintiff's Zoloft from 100 milligrams daily to 200 milligrams daily. (*Id.*).

This medical history constitutes substantial support for the ALJ's credibility determination as to plaintiff's mental health allegations. Specifically, from her alleged onset date through her date last insured, plaintiff's providers regularly noted that her mental health

symptoms were "mild" or stable/controlled with medication. (*See, e.g.,* Tr. 353-54, 473, 475, 479, 513). Further, plaintiff did not seek specialized psychological treatment or counseling during the relevant period until one week before the expiration of her insured status. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283-84 (6th Cir. 2009) (holding that while "[f]or some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself," the lack of any evidence in the record explaining the failure to seek treatment might cause a "reasonable mind" to find that a plaintiff's mental symptoms were less severe when treatment was not being sought). Additionally, the GAF scores in the record were indicative of only moderate symptomatology. *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016) (finding that a GAF score "may assist an ALJ in assessing a claimant's mental RFC"). Thus, substantial evidence supports the ALJ's determination that plaintiff was not entirely credible concerning the severity of her psychological condition.

Based on the foregoing, substantial evidence supports the ALJ's credibility determination and this assignment of error should be overruled.

### 4. *Substantial evidence supports the ALJ's RFC determination, including his consideration of the impact of plaintiff's obesity.*

Plaintiff argues the ALJ erred by failing to consider the impact of plaintiff's obesity on her ability to work. (Doc. 13 at 18-19). Plaintiff also contends the ALJ erred by failing to include in the RFC the limitations identified in Dr. Johnson and Dr. Murthy's opinions. (*Id.* at 20). Further, plaintiff argues the ALJ erred by failing to properly consider the effect of plaintiff's seizure disorder and chronic fatigue. (*Id.* at 20-21).

In formulating plaintiff's RFC, the ALJ found that because plaintiff's seizures "were relatively well-controlled," no RFC restrictions attributable to plaintiff's seizures were warranted "aside from the environmental and climbing restrictions included in the [RFC]." (Tr. 33). The

ALJ explicitly considered plaintiff's obesity in conjunction with her complaints of musculoskeletal symptoms. (Tr. 34). The ALJ concluded that even considering these conditions in combination, "the clinical signs continue[d] to support functionality of at least a light exertional level." (*Id.*). Thus, the ALJ found that considering "the compounding effect of obesity, a light-level exertional capacity with occasional postural restrictions[] is sufficient to fully accommodate her combined musculoskeletal impairments." (*Id.*). Finally, the ALJ rejected the majority of the functional limitations identified in Dr. Johnson and Dr. Murthy's opinions. (Tr. 36-37). After reviewing plaintiff's mental health records, the ALJ concluded that plaintiff was able to perform only simple, routine, repetitive tasks, was able to remember and carry out only short and simple instructions, and was able to make only simple work-related decisions. Further, the ALJ limited plaintiff to no more than superficial and occasional interaction with the general public, coworkers, or supervisors; no rapid pace work; and no more than ordinary and routine changes in work setting or duties. (Tr. 32, 35-37).

Here, substantial evidence supports the ALJ's RFC formulation. First, as explained above, substantial evidence supported the ALJ's assessment of Dr. Johnson and Dr. Murthy's opinions. Plaintiff has failed to identify additional psychological evidence that would support mental RFC restrictions beyond those included in her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (holding that plaintiff bears the burden of proving RFC limitations). Thus, as to the ALJ's assessment of mental limitations in the RFC, plaintiff's assignment of error should be overruled.

Further, as explained above in considering plaintiff's assignment of error concerning the credibility of her subjective complaints, substantial evidence supports the ALJ's assessment of plaintiff's seizure disorder. To reiterate, from plaintiff's alleged onset date through her date last insured, her providers regularly noted that her seizure disorder was well controlled with

25

medication, except for a six-month period from May through November 2011. (*See* Tr. 340-41, 358-61). Thus, plaintiff's medical history does not support any limitations attributable to her seizure disorder in excess of those limitations included in the RFC.

Finally, substantial evidence supports the ALJ's assessment of plaintiff's obesity and musculoskeletal conditions as the objective and clinical findings of record do not support restrictions greater than those identified by the ALJ in the RFC finding. For example, in February 2011, Dr. Abou-Elsaad noted 5/5 muscle strength in all extremities; normal muscle tone, bulk, and range of motion; 2+ reflexes in all extremities; and normal gait and station. (Tr. 344). In July 2011, Dr. Rubin noted no musculoskeletal abnormalities, adequate range of motion, no loss of motor strength or sensation, and normal gait. (Tr. 350). Dr. Guo noted similar findings in September and November 2011 and January 2012. (Tr. 359, 361, 363). In April 2012, consultative examiner Jennifer Wischer Bailey, M.D., noted that plaintiff's musculoskeletal examination was "entirely unremarkable." (Tr. 387). While Dr. Bailey noted that plaintiff was obese, she opined that plaintiff seemed capable of performing at least a mild amount of sitting, standing, ambulating, and bending. However, Dr. Bailey concluded that plaintiff's weight and knee pain would preclude prolonged kneeling. (*Id.*).

Knee X-rays in January 2012 revealed mild degenerative changes of the patellofemoral joint, but no other significant abnormalities. (Tr. 389). In April 2012, plaintiff was diagnosed with right plantar fasciitis and right insertional Achilles tendinitis. (Tr. 391). In July 2012, spinal X-rays revealed mild disc space narrowing of the lumbar spine with mild facet arthropathy. (Tr. 393). Plaintiff was prescribed prednisone and physical therapy. (*Id.*).

Based on this medical history, substantial evidence supports the ALJ's RFC formulation as to plaintiff's obesity and musculoskeletal conditions. Specifically, the restrictions in plaintiff's RFC were consistent with the limitations identified by Dr. Bailey after her consultative

examination. (*See* Tr. 31-32, 37-38, 387). Plaintiff has not provided any medical evidence of functional limitations related to these conditions in excess of the limitations identified by Dr. Bailey. Thus, she has failed to meet her burden of proof. *See Her*, 203 F.3d at 391.

Based on the foregoing, substantial evidence supports the ALJ's RFC formulation, including his consideration of the impact of plaintiff's obesity, and these assignments of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED**.


Date: _11/3/16_

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

LESLIE ANN SHIRLEY,　　　　　　　　　　Case No. 1:15-cv-726
　　　Plaintiff,　　　　　　　　　　　　　　Barrett, J.
　　　　　　　　　　　　　　　　　　　　　Litkovitz, M.J.

　　vs.

COMMISSIONER OF
SOCIAL SECURITY,
　　　Defendant.

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations. This period may be extended further by the Court on

timely motion for an extension. Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections. If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs. A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140

(1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).